UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:08CR 67 CDP |
| | ) | |
| CORIAN J. GREER, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

Defendant Corian J. Greer filed Defendant's Motion to Suppress Evidence (Document #21), and the government filed its Response (Document #24). An evidentiary hearing followed and a transcript of the hearing was prepared.

### Factual Background

On the evening of December 15, 2007, Cape Girardeau City Police Officer Roy Rahn was in his police vehicle, patrolling the City of Cape Girardeau, Missouri. Around 7:00 P.M., Rahn observed a Mazda automobile on the city streets with an improper registration. Rahn checked the license plate attached to the Mazda and discovered that those license numbers were assigned to a 1996 Toyota registered to Thelreal Durrant and Whitney Durrant. Rahn knew that it was a violation of a municipal ordinance to drive a vehicle with another vehicle's license plates attached to it. Rahn decided to stop the Mazda for the violation.

The Mazda pulled over at the intersection of Henderson Street and Independence Street in response to the officer's emergency lights. Rahn got out of his vehicle and made contact with the driver, Whitney Durrant. Rahn saw that three adults were in the rear seat of the Mazda, along with

a child. Corian Greer was seated in the front passenger seat. Rahn knew Greer on sight and was aware of reports that Greer sold illegal narcotics and carried firearms. Rahn obtained Durrant's driver's information and went back to his patrol car. Rahn started filling out the ticket for Durrant for Improper Registration. While doing that, Rahn radioed his dispatcher with Greer's identifiers. The dispatcher notified Rahn that Greer was currently on probation and that he had a "caution" indicator, meaning that any officer who stopped Greer should be alert to possible danger from Greer.

Rahn walked back up to the Mazda on the passenger side. He passed the ticket booklet across Greer to Durrant and asked her to sign it. While she was doing that, Rahn began talking to Greer. Rahn asked Greer if he was still on probation. Greer replied that he was. Rahn asked if Greer was in possession of any weapons. Greer replied that he was not. Rahn asked if Greer was in possession of any narcotics such as cocaine, crack cocaine or marijuana. Greer said he was not.

Rahn then asked Greer if he would mind stepping out of the car. Greer did not make a verbal reply, but he did open the door and step out. Rahn then told Greer that he was going to pat Greer down for weapons. Rahn asked Greer to lock his fingers behind his head. At that time, Greer stated that he had a bottle of "Grey Goose" vodka on him. Rahn knew that Greer was under 21 years of age and that it was a crime for him to possess alcohol. Rahn asked Greer where the vodka was. Greer replied that it was in an inside pocket of his winter coat.

Rahn started patting Greer down. When he reached the area of Greer's right rear pants pocket, Rahn felt a firearm. Greer was placed under arrest and in handcuffs. Rahn then took a Browning, .22 caliber pistol from Greer's pocket. The pistol was loaded with a round in the chamber.

Officer Marc Ashby, who had arrived and served as backup to Rahn, then searched Greer more completely. He discovered, upon Greer, the "Grey Goose" bottle, a quantity of cocaine and

a quantity of marijuana.

After Corian Greer was arrested and the other male was patted down, Rahn did retrieve his ticket book and Durrant was then released from the scene.

Greer was taken to the police station and <u>Mirandized</u>. He agreed to talk to Officer Robert Watson. Greer then made statements concerning his possession of the drugs and the firearm.

## <u>Discussion</u>

The crux of the defendant's motion to suppress is that "Officer Rahn did not have any reason to request Greer to exist the vehicle and had completed his traffic stop." (Motion, par. 9). It is the defendant's claim that the traffic stop for Ms. Durrant, the driver of the vehicle in which the defendant was a passenger, had been completed, and after the completion of the traffic stop, the interrogation of Corian Greer began. In his motion, the defendant states that Officer Rahn asked Greer to step out of the car, and Greer replied: "No." The defendant was patted down and, in the words of the defendant's motion, the result of the search yielded a quantity of what is believed to be marijuana, a .22 caliber pistol and a quantity of what is believed to be crack cocaine. The crack cocaine and the pistol are the subject of the indictment in the instant case.

The government, in its response to the defendant's motion, argues that the traffic stop was not completed when Officer Rahn asked Greer to step out of the car.

The defendant did not testify and there is no evidence to support the defendant's contention that the questioning of Corian Greer began after the traffic stop was completed. The evidence provided at the evidentiary hearing by the testimony of Officer Rahn all supports the government's contention that the traffic stop was not completed when the questioning of the defendant began.

There is no contention by the defendant that the stop of the vehicle was not legitimate. While

filling out a ticket for Durrant in his patrol car, Rahn radioed the dispatcher with Greer's identifiers. He knew Greer on sight and was aware of reports that Greer sold illegal narcotics and carried firearms.  (Tr. p. 5).  The dispatcher notified Rahn that Greer was currently on probation and that he had a "caution" indicator, meaning that any officer who stopped Greer should be alert to possible danger from Greer.  When there is a caution indicator, "It lets us know that the subject's involved in criminal activity."  (Tr. 9).  The officer is supposed to be more alert, more aware of what is going on. Rahn was aware that Greer had a prior felony conviction for narcotics.

When his backup arrived, Officer Rahn told the backup, Officer Marc Ashby, that Corian Greer was in the front seat on the passenger side.  (Tr. 7).  According to Rahn, it was general knowledge at the Cape Girardeau Police Department that Greer carried weapons and was involved in drug activities.  This knowledge of Greer's activities, according to Rahn, had accumulated over months.  Id.

When he returned to the stopped vehicle, Rahn approached the passenger side and asked Durrant to sign the ticket.  He passed the ticket book to Greer, who then gave the ticket book to the driver, Durrant.  When Durrant was signing the ticket, Rahn began talking to Greer.  (Tr. 10).  Rahn asked if Greer was still on probation, who his probation officer was, if he was in possession of any weapons or narcotics.  See United States v. Dawdy, 46 F.3d 1427, 1430 (8th Cir. 1995 cert. denied)(holding that request for identification of all occupants, explanation of presence in area and warrant check was within reasonable scope of detention); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994 cert. denied )(license and vehicle registration checks were reasonable); United States v. White, 81 F.3d 775, 778 (8th Cir. cert. denied 1996)(officer may run computer check to ascertain whether vehicle was stolen and for any outstanding warrants for vehicle's occupants).

It is axiomatic that not all personal contacts between law enforcement officers and citizens constitute seizures which implicate the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968); United States v. White, 81 F.3d at 779. There is no bright line between a consensual encounter and a Terry stop; rather, the determination is a fact intensive one which turns upon the unique facts of each case. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997) (cert. denied); United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. en banc) (cert. denied 1991). "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area– even if the officer has no reason to suspect the individual is involved in criminal activity–provided the officer does not indicate that compliance with his request is required." White, 81 F.3d at 779. The transformation of a consensual encounter into a Terry stop occurs only "when the questioning is so 'intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave.'" Hathcock, 103 F.3d at 718.

When Rahn approached the passenger side of the vehicle and began to ask Corian Greer if he was still on probation, if he had any weapons or drugs, this was a consensual encounter which does not implicate the Fourth Amendment. Michigan v. Chesternut, 486 U.S. 567, 574-76, 108 S.Ct. 1975, 1979-81 (1988). Because Corian Greer was not in custody, Officer Rahn's questions concerning his probation and whether he was transporting any illegal drugs or weapons were perfectly proper. United States v. Boucher, 909 F.2d 1170, 1172 (8th Cir. 1990). In the Boucher case, a Missouri Highway Patrol Trooper, while issuing the defendant a traffic ticket for speeding, asked Boucher whether he had any weapons, drugs or large quantities of cash in his pickup. Boucher denied that he did and the trooper asked him if he could have a look in the pickup. Boucher consented. No Miranda warnings had been given. The Court of Appeals for the Eighth Circuit held

that Boucher was not in custody prior to a formal arrest which took place after the trooper's routine questioning and prior to a search of the trunk of defendant's vehicle. The Court held that no waiver of Boucher's Fifth Amendment rights were required pursuant to <u>Miranda</u> until he was arrested.

In response to Officer Rahn's questioning, the defendant gave the name of his probation officer and said he was still on probation. But as to whether he had any weapons or drugs, the answer was "no." Rahn testified that the tone of voice used was that used in "[j]ust a regular conversation" and was cordial. The defendant did not show any anger. He did not decline to answer any questions. According to Rahn, the officer asked the defendant if he would mind stepping out of the vehicle. Rahn characterized the question as a request, not a command. The defendant gave no verbal reply, but "He reached for the door handle, opened the door and stepped out." (Tr. 13). Rahn continued: "As he stepped out of the vehicle, I advised him that since he had a caution indicator on his response from communications and my personal knowledge, that I was going to go ahead and conduct a pat down on him for weapons." <u>Id</u>.

As the government points out in its response, an officer who has legitimate contact with another person and who has reason to believe that person may be armed and dangerous, may conduct a pat-down search to protect officer safety, regardless of whether there is probable cause to arrest. <u>United States v. Menard</u>, 95 F.3d 9, 10 (8th Cir. 1996), citing <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868 (1968). As noted earlier in this case, Officer Rahn was aware that the defendant was a felon, having been convicted of a narcotics felony, was known to carry weapons and that there was a caution indicating that he could be dangerous. The pat-down of Corian Greer was legitimate. <u>Menard</u>, <u>supra</u>. The pat-down led to the discovery of the weapon, a Browning .22 caliber pistol loaded with a round in the chamber. The defendant was later searched more completely and, besides

the "Grey Goose" bottle of vodka, cocaine and marijuana were both found.

As mentioned, all the evidence at the hearing suggests that by his actions, Corian Greer consented to leave the vehicle. The court finds defendant's stepping out of the vehicle following Officer Rahn's request was consensual.

However, even had the exit from the vehicle not been consensual, in Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, the Supreme Court held that the rule of Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, that a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle extends to passengers as well. Id., 519 U.S. at 410, 117 S.Ct. at 884. The Supreme Court discussed its ruling in Mimms saying, "We thought it 'too plain for argument' that this justification--officer safety--was 'both legitimate and weighty.' (citation omitted) In addition, we observed that the danger to the officer of standing by the driver's door and in the path of oncoming traffic may also be 'appreciable.' Id. at 111, 98 S.Ct. at 333." The Court gave its reasoning for extending the holding of Mimms to passengers as well:

> But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

Id. at 414, 117 S.Ct. at 886. The Court concluded its discussion in the following way:

> In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer

making a traffic stop may order passengers to get out of the car pending completion of the stop.

Id. 414-415, 117 S.Ct. at 886.

With respect to whether the traffic stop was completed when Officer Rahn began to speak with Corian Greer, the only testimony is that of Officer Rahn. Rahn was already looking into Greer's status early in the traffic stop. When Rahn was first checking driver Durrant's license in his patrol car, he also radioed his dispatcher with Greer's identifiers and learned that Greer was on probation and he had a "caution" indicator. He went back to Durrant's vehicle approaching on the passenger side. Rahn testified, "I was talking to Greer at the same time I passed the book in and Greer handed it to the driver." (Tr. 23). "I didn't have the ticket book back when I was talking to Mr. Greer and asking him if he was on probation, if he had any weapons or narcotics on him. He advised me that he didn't, that he was still on probation but he didn't have any drugs or weapons or anything like that on him. At that point, I asked him if he would mind stepping out of the vehicle." (Tr. 25). Ms. Durrant handed the ticket book back to Officer Rahn after Rahn was talking to the defendant. (Tr. 25). At the end of the stop, Rahn told Durrant that she was free to go, after he had searched Greer. (Tr. 26). Rahn testified further that the end of the traffic stop was "after Mr. Greer was taken into custody and he was secured, the weapon was secured. We eventually had everybody step out of the vehicle. Upon that is when I actually discovered that there was a small child in the vehicle when they got out. There was another male subject in the vehicle. I conducted a pat down on him, and then once the vehicle was checked, they were released with the vehicle." (Tr. 26).

The dispatcher's log also supports Officer Rahn's testimony that the traffic stop was completed when the defendant was under arrest and en route to the police station. (Tr. 33).

With regard to the defendant's statements made after his arrest, the defendant does not claim that there were any <u>Miranda</u> violations. Defendant's motion for suppression of his statements is based on the fact that he felt it was illegal to have him, the defendant, step out of the vehicle which led, in the defendant's argument, to an improper discovery of contraband and an illegal arrest.

The court has found that the defendant consented to step out of the vehicle and that if he did not consent, Officer Rahn was authorized to require the defendant to step out of the vehicle under <u>Maryland v. Wilson</u>, cited above, because of the danger to the officers posed by the defendant who was known to carry weapons and to engage in trafficking in narcotics, Officer Rahn was entitled to conduct a pat down search which, in turn, led to the discovery of the weapon and the illegal drugs.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Document #21) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of August, 2008.